708 A.2d 1047

## The MILTON COMPANY, et al.

v.

## COUNCIL OF UNIT OWNERS OF BENTLEY PLACE CONDOMINIUM.

No. 1696, Sept. Term, 1996.

Court of Special Appeals of Maryland.

April 29, 1998.

Kevin P. Kennedy, Rockville, and J. Mitchell Kearney (Brown, Diffenderffer, Wagonheim & Kearney, LLP, on the brief), Towson, for Appellants.

Barry L. Steelman (Nicholas D. Cowie, on the brief), Baltimore, for Appellee.

Roger D. Winston and Linowes and Blocher LLP, Suburban Maryland Building Industry Association, Silver Spring, for Amicus Curiae.

Before MURPHY, C.J., and WENNER, J., and JOHN F. KELLY, Sr., Judge (Specially Assigned).

MURPHY, Chief Judge.

In the Circuit Court for Montgomery County, the Council of Unit Owners of Bentley Place Condominium, appellee, filed a complaint against the Milton Company and Tuckerman Lane Development Company, Inc., appellants. Appellee asserted that appellants were responsible for certain defects that existed in the common elements and individual units of the Bentley

Place Condominium, and owed damages as a result of their (1) negligence, (2) breach of implied warranty, (3) breach of contract, (4) breach of fiduciary duty, (5) breach of express warranties, (6) negligent misrepresentation, (7) violation of the Maryland Consumer Protection Act, and (8) civil conspiracy.

A jury (the Honorable Michael D. Mason, presiding) returned verdicts in favor of appellee and against both appellants on all but the civil conspiracy and fiduciary duty counts.[1] The jury resolved the negligent misrepresentation count in favor of appellee and against appellant Milton. This appeal followed in which appellants present the following questions for our review:

I. Did the trial court erroneously instruct the jury that it may award damages for alleged common element defects for breach of implied warranty without a finding that the Council complied with the notice and limitations provisions of Title 11?

II. Did the trial court err in holding that the Council has standing to assert common law causes of action on behalf of two or more unit owners for alleged common element defects?

III. Did the trial court err in holding that individual unit owners have common law causes of action with respect to alleged common element defects?

IV. Is the jury verdict for damages to each and every unit at the Project proper in the absence of evidence supporting each unit owner claim?

V. Were the appellants prejudiced by the trial court's admission into evidence of unit owner surveys containing double and triple hearsay and upon which the Council's primary expert relied in rendering his opinion concerning defects in the Project?

---

1. Prior to trial, appellants moved for partial summary judgment. The circuit court granted that motion with respect to the civil conspiracy claim, and dismissed the breach of fiduciary duty claim at the close of appellee's case.

VI. Was the trial court's award of attorneys' fees and litigation expenses supported by the record?

For the reasons that follow, we shall affirm the judgments of the circuit court.[2]

## FACTUAL BACKGROUND

Appellee is an unincorporated association of 240 families who purchased homes at the Bentley Place Condominium, a residential garden condominium project located in Montgomery County, Maryland. Tuckerman was the "developer" of the condominium and Milton was the general contractor responsible for hiring subcontractors to perform construction work.

Prospective purchasers of the condominiums were provided with a standardized "Sales Agreement" and contract addenda. Paragraph 1 of the Sales Agreement provides that the individual homeowner has contracted to purchase an identified dwelling unit "together with an undivided interest in the common elements." In Paragraph 6 of the Agreement, "[s]eller agrees to erect or construct the Unit ... substantially according to plans and specifications."

In September of 1989, appellee notified appellants that there were numerous defective conditions at the condominium, and requested that appellants make repairs. Thereafter, the parties discussed the resolution of appellee's complaints. These discussions resulted in the execution of a January 23, 1991 Agreement to Extend Statute of Limitations (the "Tolling Agreement") through April 1, 1991. While the parties attempted to negotiate a resolution, this agreement was later extended through October 31, 1991. Having failed to negotiate a satisfactory resolution, appellee filed its complaint on October 30, 1991.

---

**2.** Appellee has filed a Motion to Dismiss this appeal arguing that it was not filed within 30 days of the final judgment. There is no merit in that argument, so we shall deny the Motion to Dismiss and address the merits of the case.

**I**

Appellants argue that Judge Mason should not have allowed appellee to assert an implied warranty claim for alleged common element defects under Md.Code Ann.(1974, 1996 Repl.Vol.), § 10–203 of the Real Property Article ("RP"). According to appellants, appellee could only assert an implied warranty claim under RP § 11–131(c). If appellants are correct, Judge Mason should not have instructed the jury that it may award breach of implied warranty damages for alleged common element defects without first finding that appellee complied with the notice and limitations provisions of RP § 11–131(d).

Title 11 of the Maryland Real Property Article, known as the Maryland Condominium Act, applies to all condominiums established in Maryland after July 1, 1982. RP § 11–107(a) provides that each unit owner shall own an undivided fee simple interest in the common elements of the condominium. Recognizing the unique ownership interest created in condominium developments, the General Assembly created an implied warranty with respect to common elements. That warranty specifically includes the protections referenced in § 11–131(c), as well as those set forth in RP § 10–203. The warranty extends for a period of three years from the first transfer of title to a unit owner (or from the time that the unit has been completed). RP § 11–131(c)(3). RP § 11–131(c)(4) requires that notice of a defect be given within the warranty period, and that suit for enforcement of the warranty must be brought within one year of the warranty period. The implied warranty in § 11–131(c) runs from a "developer" (defined in § 11–101(g)), to the council of unit owners. RP § 11–131(c)(4) of the Act provides that

> [a] suit for enforcement of the warranty on general common elements shall be brought only by the council of unit owners. A suit for enforcement of the warranty on limited common elements may be brought by the council of unit owners or any unit owner to whose use it is reserved.

Appellants argue that appellee has no viable claim for implied warranties other than that specifically provided for in Title 11 of the Real Property Article. Judge Mason rejected that argument, concluding instead that the implied warranty found in RP § 10–203 also applies to condominium owners. Unlike the implied warranty found in Title 11, this warranty deals with the sale of property in general, runs from a "vendor" to the owner, extends for a period of two years from the date of conveyance, and does not require that notice of defect be given within the warranty period.

Appellants argue that, due to the unique ownership interest in condominium property, Title 11 was not enacted to create additional implied warranties for common elements, but rather to create exclusive warranties for condominiums. According to appellant, because Title 11 reserves such claims exclusively to the council, condominium owners do not have individual implied warranties against "vendors" or anyone else for common element defects.

In *Starfish Condominium Ass'n v. Yorkridge Service Corp.*, 295 Md. 693, 699–701, 458 A.2d 805 (1983), decided before the enactment of Title 11, the Court of Appeals held that Title 10 warranties do apply to newly constructed condominiums. In *Antigua Condominium v. Melba Investors*, 65 Md.App. 726, 501 A.2d 1359 (1986), *rev'd* 307 Md. 700, 517 A.2d 75 (1986), decided after the enactment of Title 11, this Court held that condominium warranties were governed by the shorter one year limitation period of RP § 11–131(d), and not the two year limitations prescribed in RP § 10–204(d). We reasoned as follows:

> When § 11–131(a) made the express and implied warranties of §§ 10–202 and 10–203 applicable to condominium sales, it specifically provided a one year period of limitations for them in § 11–131(d). The provisions of § 10–204, containing a two year limitation period, were not made applicable to condominiums by § 11–131.

*Id.* at 745, 501 A.2d 1359. The Court of Appeals, however, concluded that our reasoning was based on a "premise [that]

was faulty", namely: "that Title 10 warranties had not applied to condominiums [prior to the effective date of § 11–131] and that the enactment of RP § 11–131(a) first made § 10–202 and § 10–203 applicable to condominium developers." *Antigua Condominium,* 307 Md. at 725, 517 A.2d 75. Judge Mason came to the following conclusions regarding the interplay between Title 10 and Title 11:

Really what Title 11 sought to do was to make sure—in some of the cited cases, it looked to me like occasionally there were persons who sort of got out on the issue of liabilities because they really weren't vendors and so Title 11 really sought to hold those kinds of persons, the developers, and say you can't avoid liability by not falling within the definition of a vendor, we are going to make you liable as a matter of law so you vendors will henceforth also be liable, but vendors were and still are liable.

Judge Mason therefore allowed the jury to deliberate on two different standards for statutory implied warranties; one under Title 10, which does not require proof of notice of defects, and one under Title 11, which does require proof of notice of defects. He delivered the following instructions:

Now, before describing for you the implied warranties which are imposed by statute let me define two terms for you because different persons and specifically vendors and developers who are considered persons within the law by law give different implied warranties.

So let me first define those two terms for you, vendor and developer. A vendor means any person engaged in the business of erecting or otherwise creating an improvement on realty.

A developer means anyone who subjects his property to a condominium regime. Now, here I would tell you that as a matter of law that the only developer could be the Tuckerman Lane Development Company because they are the ones who actually signed off on the condominium regime which was filed. In other words, Milton is not a developer, okay. However, as you can tell from the definition of a vendor a

developer may under the facts of a particular case also be a vendor. In other words the term vendor is broad enough under certain facts to include a person who is also a developer, okay.

Now, with respect to the implied warranties. First there are implied warranties found in what we refer to as Title 10 of the real property statute or real property article.

Under Title 10 of the Maryland real property article there is provided an implied warranty that runs from the vendor to the unit owner that at the time of the delivery of the deed to a completed improvement or at the time of a completion of an improvement not completed where the deed is delivered the condominium unit is:

One, free from faulty materials;

Two, constructed according to sound engineering standards;

Three, constructed in a workmanlike manner; and

Four, fit for habitation.

The warranty period is two years from the date of conveyance of a unit. There is no requirement that the vendor be given notice of the defects under Title 10 within the warranty period.

Now, I told you about Title 10. Under Title 11 of the Maryland real property article there is provided an additional implied warranty. This is on the common elements of a condominium and this runs from the developer to the council of unit owners.

Common elements means all of the condominium except the individual units. The implied warranty applies to the following: the roof, the foundation, external and supporting walls, mechanical, electrical, plumbing systems and other structural elements.

The warranty is that the developer is responsible for correcting any defect in materials or workmanship and that the specified common elements are within acceptable industry standards in effect when the building was constructed.

The warranty period is three years from the date of the first conveyance of a unit at the condominium. The warranty of any common elements not completed at that time shall commence with the completion of that element or with its availability for use by all unit owners whichever occurs later.

Now, under Title 11 a developer is not responsible for a breach of the aforegoing implied warranty which is found in Title 11 unless he has given notice of such breach within the applicable warranty period.

To summarize, then, there are two types of implied warranties that apply to the facts of this case and the sale of the condominiums herein.

The first is from the vendor to the unit owners under Title 10 and the second is from the developers to the council of unit owners under Title 11 which incorporates specifically in the body of that title the warranties as I have just elaborated on them, specifically under Title 11.

■ Appellants argue that because these instructions were unclear and confusing, the jury's verdict in favor of the appellee on the implied warranty count does not permit any way of determining whether the verdict was based on a finding that the appellants received notice of the defects or whether the jury simply based its verdict on the relaxed standard which did not require notice as a prerequisite to liability. In support of their argument, appellants rely on two cases that are clearly distinguishable. It is true that in *Home Beneficial Life Ins. Co. v. Partain*, 205 Md. 60, 71, 106 A.2d 79 (1954), the Court of Appeals held that a new trial is required when instructions failed to distinguish a supportable claim from other claims that could not be supported by the evidence. It is also true that in *Dechello v. Johnson Enterprises*, 74 Md.App. 228, 240–43, 536 A.2d 1203 (1988), this Court held that confusing jury instructions required a remand for a new trial. As we see it, however, Judge Mason's instructions regarding Title 10 and Title 11 were clear, concise, and correct. Appellants' true concern with the instructions is that

appellee was permitted to seek damages under the implied warranty provided for in Title 10. As Judge Mason was correct in his conclusion that appellee could do so, no error exists in the instructions that were delivered.

## II

Appellants argue that appellee should not have been allowed to assert common law claims with respect to the common elements. According to appellants, because RP § 11–131(c) is the exclusive source of standing to sue for common element related matters, the claims for common element damages should have been limited to a warranty claim under that statute. We disagree. Appellee may sue in two capacities to enforce property interests it does not own: (1) representative actions under RP § 11–109(d)(4); and (2) direct (non-representational) actions under RP § 11–109(d)(19).

**(1) Representative actions under RP § 11–109(d)(4).**

■ RP § 11–108.1 assigns to a council the responsibility for maintaining and repairing the common elements on the unit owner's behalf. As an entity, a council typically owns no property interest. For this reason the General Assembly enacted RP § 11–109(d)(4), which provides the council of unit owners with the power

> [t]o sue and be sued, complain and defend, or intervene in litigation or administrative proceedings in its own name on behalf of itself or two or more unit owners on matters affecting the condominium.

Thus, a council has a statutory grant of representational standing to pursue remedies belonging to the unit owners. In *Starfish Condominium Ass'n,* the Court of Appeals explained that RP § 11–109(d)(4) merely "created a new procedure" whereby the council was granted standing to sue on behalf of "two or more unit owners" for purposes of asserting claims that any single unit owner might have brought as an individual. 295 Md. at 708, 458 A.2d 805.

■ Appellants contend, however, that the statutory grant of representational standing under RP § 11–109(d)(4) is limit-

ed to suits for statutory implied warranties. We disagree. Nothing in RP § 11–109(d)(4) or in *Starfish* supports such a limitation.

Under RP § 11–107(a), each unit owner who purchases a condominium property obtains an undivided percentage ownership interest in the common elements. Thus, each unit owner is able to assert individual ownership in the entire common elements. Since each has an ownership interest in the entire common elements, any single unit owner or group of owners may bring suit and seek the entire damage to the common elements. Under the Court of Appeals' holding in *Starfish,* a council suing on behalf of at least two unit owners may seek and recover "the entire damage to the common elements" even though other unit owners who were legally barred from recovery would benefit. *Id.* at 707–08, 458 A.2d 805.

In *Starfish,* the Court rejected the argument that individual unit owners' entitlement to damages should be limited by their percentage ownership, and cited with approval the case of *Stony Ridge Hill Condominium Owners Ass'n v. Auerbach,* 64 Ohio App.2d 40, 410 N.E.2d 782 (1979), in which the court rejected the developer's contention that, because only four of the twenty four unit owners were told that the roof of the building was a "twenty year roof," the council of unit owners could not assert a claim on behalf of the other twenty owners:

> "[E]ach person who purchased a condominium unit ... has a right to have the whole damage to the entire common area of the building remedied and completely satisfied." Otherwise, "[p]ayment by defendants of only one-sixth of the roof damage, representing the share of four unit owners, and the consequent repair of only one-sixth of the roof would still leave the roof in the same leaky condition, and would be the equivalent of giving plaintiff no legal remedy or relief whatever."

*Starfish, supra* at 707, 458 A.2d 805 (quoting *Stony Ridge, supra* at 43–44, 410 N.E.2d 782).

### (2) Direct(non-representational) Actions Under RP § 11–109(d)(19).

RP § 11–131(c) creates an implied warranty applicable to common elements that runs directly to a council. This statute does not, however, provide a council with standing to sue in a non-representational capacity for damage to property it does not own. Such authority has been granted by an amendment to RP § 11–109, which now provides a council with the following power:

(19) To enforce the implied warranties made to the council of unit owners by the developer under § 11–131 of this title;

■ Appellants argue that the enactment of RP § 11–131(c) was intended to replace RP § 11–109(d)(4) as the sole means by which a suit can be brought for matters relating to the common elements. Judge Mason concluded that

notwithstanding the language that appears in Title 11 that there is nothing in that language which is inconsistent with or deprives the unit of counsel [sic] owners of the authority that they had prior to the enactment of Title 11 to bring common law claims on behalf of two or more unit owners with respect to the common element.

We agree with that conclusion.

Appellants claim that, if RP § 11–131(c) is not the exclusive source of authority for appellee to sue with respect to common elements, individual unit owners could assert claims of their own and this process "would result in a multiplicity of lawsuits" and "inconsistent adjudications of claims." There is no merit in that argument. A final judgment obtained by a council has res judicata effect on duplicative individual unit owner suits; the doctrine of res judicata protects against a multiplicity of litigation and eliminates the danger of contradictory adjudications. Duplicative suits brought prior to final judgment can be consolidated. Md. Rule 2–503(a)(1). The *Starfish* Court recognized the possibility of "multiple or successive suits" if unit owners chose not to take advantage of RP § 11–109(d)(4), but noted that any such suits could be man-

aged effectively under the Maryland Rules. *Id.* at 708, 458 A.2d 805.

### III

 Appellants argue that even if the individual unit owners were allowed to assert common law causes of action for common element claims, and appellee has standing to assert those actions on behalf of more than one but less than all of the unit owners, the award for damages on those claims must be reversed because they constitute what the Court of Appeals has characterized as "economic" losses. Such losses include "the loss of value or use of the product itself, the cost to repair or replace the product, or the lost profits resulting from the loss of use of the product." *A.J. Decoster Company v. Westinghouse Electric Corp.,* 333 Md. 245, 250, 634 A.2d 1330 (1994).

 Tort recovery for purely economic losses is ordinarily not allowed in product defect cases. *United States Gypsum Company v. Mayor and City Council of Baltimore,* 336 Md. 145, 156, 647 A.2d 405 (1994). "Instead, a purchaser suffering only economic loss because of a defective product will normally be limited to contract causes of action, including breach of implied and express warranties." *Id.* The Court of Appeals has held, however, that a plaintiff may recover in tort for purely economic loss where the defect creates a substantial and unreasonable risk of death or personal injury. *Council of Co-Owners v. Whiting-Turner,* 308 Md. 18, 35, 517 A.2d 336 (1986).

 In the present case, Judge Mason observed that some of the defects "clearly ... pose a risk of serious physical injury." We agree with that observation.[3] Moreover, when parties to a negligence action share an "intimate nexus," satisfied by "privity of contract or its equivalent," recovery in

---

**3.** One example Judge Mason cited was appellants' use of undersized cathedral beams.

negligence may be had for "economic loss," despite the absence of any risk that personal injury will result:

> Where the failure to exercise due care creates a risk of economic loss only, courts have generally required an intimate nexus between the parties as a condition to the imposition of tort liability. This intimate nexus is satisfied by contractual privity or its equivalent. By contrast, where the risk created is one of personal injury, no such direct relationship need be shown, and the principal determinate of duty becomes foreseeability.

*Jacques v. First National Bank,* 307 Md. 527, 534–35, 515 A.2d 756 (1986).

In *Weisman v. Connors,* 312 Md. 428, 540 A.2d 783 (1988), the Court of Appeals held "pre-contractual negotiations" between parties to a negligence action constituted a sufficiently close relationship to satisfy the "intimate nexus" requirement, thereby justifying the imposition of a tort duty even though the plaintiff had suffered only economic loss with no risk of personal injury. *Id.* at 445–451, 540 A.2d 783. Judge Mason, using *Jacques* and *Weisman* as guidelines, concluded that

> this is the kind of case where the court may and under the facts of this case should recognize the existence of a tort duty arising out of the facts and circumstances surrounding the making of the contract.

We agree with that conclusion.

### IV

Appellants contend that, in the absence of evidence supporting each unit owner claim, the evidence was insufficient as a matter of law to support the jury verdict for damages to each and every unit at the project. Appellants also contend that many of the unit owners' claims are barred by the statute of limitations and that subsequent purchasers (owners who did not purchase their unit from the appellants) are barred as a matter of law from claiming damages.

During the trial, appellee called only seven of the 240 unit owners to testify. As to each cause of action, however,

the jury awarded unit damages against appellants under the category of "(ix) Plumbing" in the amount of $440,000.00,[4] and under the category of "(x) HVAC"(heating and air conditioning systems) in the amount of $550,000.00. Appellants contend that the unit owners who failed to testify were unjustly awarded damages because appellees produced no evidence that their particular units sustained actual damages. As discussed earlier, RP § 11–109(d)(4), authorizes the council of unit owners to sue in its own name on behalf of unit owners. As a result, appellee had the right to recover for damages to all of the individual units. Moreover, the jury received evidence that the problems with the plumbing and HVAC systems affected nearly all of the 240 units.[5]

 Appellants argue to us that many of the unit owner's claims were barred by the statute of limitations. Assuming that this issue has been preserved for appeal,[6] we agree with Judge Mason that the Tolling Agreement entered into by the parties sufficed to toll all of the warranty claims, including

4. The category of "Plumbing" included "appliances and fixtures."

5. Appellee's mechanical engineering expert testified that all HVAC systems at the Condominium were installed in a defective, unworkmanlike manner in violation of acceptable industry standards and the minimum requirements for heating and cooling under the Maryland Code. He testified as to what it would cost to remedy each aspect of the defective HVAC systems and, without any objection by appellants, gave a total repair figure for each unit. He totaled the entire cost at $779,160.00, excluding 34 HVAC systems that had already been replaced. Appellee's plumbing expert testified about his investigation of the poor quality and premature failure of fixtures and appliances used throughout the Condominium, and determined that the cost difference between "appliances and fixtures" promised and those actually received was $376,286.00. He also testified that defective, unworkmanlike plumbing resulted in damages of $65,280.00.

6. Appellants took no exception to the instructions on the ground that the jury had been told an incorrect warranty period applicable to unit damages. Because this argument was not presented with sufficient particularity to the trial court, we could conclude that the "limitations" issue has not been preserved for our review. *Harmony v. State*, 88 Md.App. 306, 317, 594 A.2d 1182 (1991).

individual unit owner claims, rather than just the implied warranties on common elements.

▉▉▉▉ We reject the contention that because the owners who purchased units from a third party lack the necessary privity to bring the common law claims, unit owners who were subsequent purchasers are barred as a matter of law from claiming damages. We also reject the contention that the relevant warranties in this case do not apply to non-original purchasers of the condominium units. RP § 10–204(c) extends warranty protection to subsequent purchasers for Title 10 implied and express warranties. The RP § 11–131(c) warranty runs directly to a council. No damages for unit defects were awarded under appellee's Title 11 implied warranty claim since Judge Mason instructed the jury that this warranty applied only to common elements. As for appellee's Consumer Protection Act claims, subsequent purchasers are not barred from raising such claims. The Court of Appeals has not held

> that the only entity that can engage in a deceptive trade practice is one who directly sells or offers to sell to consumers. It is quite possible that a deceptive trade practice committed by someone who is not the seller would so infect the sale or offer for sale to a consumer that the law would deem the practice to have been committed "in" the sale or offer for sale.

*Morris v. Osmose Wood Preserving,* 340 Md. 519, 541, 667 A.2d 624 (1995).

▉▉▉▉ Appellee's witnesses included a subsequent purchaser who testified that he looked at appellants' sales models at the condominium and relied on appellants' brochures in making his decision to purchase a unit there. With regard to appellee's common law claims, this Court held in *St. James Construction Co. v. Morlock,* 89 Md.App. 217, 222–223, 597 A.2d 1042 (1991), that homeowners who were subsequent purchasers could assert a common law negligence action against the original builder of a home. The fact that the plaintiff is a subsequent purchaser, and not in privity with the builder who

sold the home to the original purchasers, does not prevent a cause of action by the subsequent purchasers for negligent construction and design. *Council of Co–Owners Atlantis Condominium, Inc. v. Whiting–Turner Contracting Co.*, 308 Md. 18, 22, 517 A.2d 336 (1986).

## V

Appellants argue that Judge Mason erroneously admitted into evidence documents described as unit owner surveys, because those exhibits contained double and triple hearsay. Prior to trial, appellee's expert witness, Robert W. Davidson, A.I.A., created a ten-page detailed survey form. The surveys were then conducted by unit owner volunteers, after having completed a four-hour training session. One hundred and fifty five (155) out of 240 forms were completed. Each one contained the volunteers' personal observations of common element defects as well as comments made to the volunteer by the individual unit owner.

Mr. Davidson testified that the surveys were conducted in part to substantiate his opinions on the need for replacement of fire retardant plywood on 10 (of 20) buildings, and on the extent of the sound transmission problem caused by appellants' failure to construct floor/ceiling assemblies in accordance with plans and specifications. Appellants were provided with copies of the surveys during pretrial discovery. To verify the accuracy of the surveys, appellants' expert witness conducted his own investigation and prepared his own surveys (of 23 of the 80 attic spaces). That investigation included interviews with homeowners.

During the trial, each side's expert expressed a different conclusion on the basis of the very same surveys. Appellants made use of the surveys to support their own case, as well as to challenge the credibility of the appellee's expert, claiming that he had failed to report survey data accurately. Appellants' expert also used the surveys as a basis for his opinions. Following the rebuttal testimony of its expert, appellee offered the surveys into evidence, appellants objected, and Judge

Mason gave the following explanation for his decision to allow the surveys into evidence:

> [O]ne of obviously the most significant issues will be who is this jury to believe: [appellants' expert or appellee's expert], and that is certainly one of the most clear issues on which they are so clearly divided and one in which the jury could look at the same documents and come to their conclusions and thereby test the credibility of both witnesses.

 "[A] trial judge is given broad discretion in ruling on the admissibility of expert testimony. Seldom will the decision in this regard be reversed." *Simmons v. State*, 313 Md. 33, 43, 542 A.2d 1258 (1988). We are not persuaded that Judge Mason erred or abused his discretion when he admitted the unit owner surveys so the jurors could fairly evaluate the conflicting expert opinions.

> An expert may give an opinion based on facts contained in reports, studies or statements from third parties if the underlying material is shown to be of a type reasonably relied upon by experts in the field. In addition, the underlying, reports, data, or statements themselves may be admitted into the evidence for the purpose of explaining the basis of the experts opinion.

*U.S. Gypsum v. Baltimore*, 336 Md. 145, 176, 647 A.2d 405 (1994) (citations omitted). For an expert to rely upon hearsay evidence as the basis for his opinion, that reliance must be reasonable. *Hartless v. State*, 327 Md. 558, 579, 611 A.2d 581 (1992). Appellee's expert witness testified that the surveys were the type of information that his office and others in his field reasonably relied upon in rendering opinions concerning the construction of residential condominiums. He also testified that he and/or other architects in his firm personally verified the surveys and found them to be accurate. Judge Mason found that "these reports are of a kind that their reliability can be determined and that they are in fact verifiable ..." That finding was not clearly erroneous. The decision to admit the surveys was neither erroneous nor an unfairly prejudicial abuse of discretion.

## VI

Judge Mason awarded to appellee (1) attorneys' fees of $500,000 for both the contract and Consumer Protection Act claims, and (2) expert expenses of $228,830 for the Consumer Protection Act claim. Appellants' final argument is that these awards are not supported by the evidence.

 Appellants complain that, at the hearing on appellee's Motion for an Assessment and Award of Damages for Attorneys' Fees and Expenses, appellee never presented any contemporaneous time records to establish how much time its attorneys spent working on the case. Judge Mason relied instead on a compilation of those records as well as expert testimony based in part on a review of the compilation. Appellee argues that the compilation itself was admissible under Maryland Rule 5–1006, and the foundation for admission of the compilation would have been established by testimony as to its preparation. Judge Mason ruled, however, that no foundational testimony was necessary because the unrebutted testimony of appellee's expert witness provided a sufficient basis for the award of fees. We agree with Judge Mason that the original time records were not required.

 "[A] trial court enjoys a large measure of discretion in fixing the reasonable value of legal services. That amount will not be disturbed unless it is clearly an abuse of discretion." *Head v. Head,* 66 Md.App. 655, 669, 505 A.2d 868 (1986) (citations omitted). Judge Mason held a formal hearing and received substantial evidence on which to base his award of attorney fees and expert expenses.

> While time is one of the applicable factors, the record need not contain evidence specifically delineating the number of hours spent by counsel. Because the record itself discloses the nature of the proceedings, it is some evidence of the extent of the attorney's efforts. Given this evidence, the chancellor may rely upon his own knowledge and experience in appraising the value of an attorney's services.

*Foster v. Foster,* 33 Md.App. 73, 77, 364 A.2d 65 (1976). Moreover, appellants could have moved to compel the production of the original records. Maryland Rule 5–1006. Appellants were entitled to "a realistic opportunity to challenge those fees and expenses. . . ." *Maxima v. 6933 Arlington Dev.,* 100 Md.App 441, 453, 641 A.2d 977 (1994). We are persuaded that they received the opportunity to which they were entitled.

 Appellants also contend that the attorney's and expert fees should have been reduced according to a formula contained in the Sales Agreements. Assuming that this issue has been preserved for appeal,[7] we hold that the contractual limitation in the Sales Agreements does not apply to fees awarded under the Consumer Protection Act. Such a limitation is inconsistent with the General Assembly's goal of protecting the public from unlawful consumer practices. See *Consumer Protection Division v. Luskin's,* 120 Md.App. 1, 26, 706 A.2d 102 (1998). A party may not repeal an important provision in the Consumer Protection Act by placing into the contract a counsel fee limitation clause. Judge Mason's award of attorney's fees and expenses does not constitute an abuse of discretion.

**JUDGMENTS AFFIRMED; COSTS TO BE PAID BY APPELLANTS.**

---

**7.** Although the issue of attorney's fees was raised at trial, appellants never requested that expert witness fees be reduced.